UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES SULTAN,

        Plaintiff

v.                                                  CIVIL ACTION
                                                    NO. 04-11107-MLW

VERIZON COMMUNICATIONS, INC.

        Defendant

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Summary of Plaintiff's Opposition to Defendant's Motion for Summary Judgment

Justice Kass observed that Massachusetts courts have long recognized that "evidence of discrimination would be circumstantial... It was not likely that employers would declare forbidden bias frontally by, e.g., the publication of policy statements that blacks would be excluded from executive positions or that employees over the age of fifty were to be phased out at the earliest opportunity. Rather, most cases of unlawful discrimination would be stitched together..." Johansen v. NCR Comten, 30 Mass. App. Ct. 294, 298 (1991).

The facts supporting the plaintiff's case (see Plaintiff's Affidavit and Exhibits) may be "stitched" together as follows:

1.) Plaintiff, for almost twenty years an employee of Verizon (or its corporate predecessors) is unhappy with developments at work following the merger of his then employer, Bell Atlantic, with GTE to create Verizon. Particularly, he has voiced his concerns to his new supervisor, Harvey Jackson, about a new policy in which there is a dramatic increase in the delegation of work and authority away from long time employees to younger contract workers.

1

2.) Plaintiff requests, as he puts it, an "audience" with Mr. Jackson's boss, Bruce Merkis.

3.) Such a meeting is held in Pearl River, N.Y. on 7/31/00. Present are the plaintiff, Mr. Merkis, Harvey Jackson and Bill Driscoll (a contract worker to whom much of the plaintiff's engineering work and authority had been given).

4.) At the Pearl River meeting, Mr. Merkis, in the presence of Mr. Jackson:

    a. Asked the plaintiff his age;

    b. Suggested that he couldn't keep up with the younger workers; and

    c. Told him he wanted the plaintiff gone.

5.) Within days, Mr. Jackson presents the plaintiff with a highly unfavorable job performance review.

6.) This is unusual, because since he started with Verizon's corporate predecessors on April 4,1983, the plaintiff had received steady raises, bonuses and promotions, going from a yearly salary of $30,790.00 in 1987 to $74,300.00 in 2000.

7.) Things do not improve, but there is a diversion: a strike. Plaintiff and others in managerial positions fill in until the labor dispute is resolved. Plaintiff renders invaluable service, having been named Strike Coordinator by Harvey Jackson.

8.) When things are running normally again, the plaintiff believes his performance is again being unfairly denigrated and that he is being set up for termination due to his age, in conformance with the apparent bias articulated by Bruce Merkis.

9.) In March of 2001, Mr. Jackson informs the plaintiff that he is going to be put on a so-called Performance Improvement Plan ("PIP").

10.) Plaintiff, rightly or wrongly, believes he is entitled to have a co-worker present at

2

such a PIP meeting. He has been told the PIP process could lead to his dismissal, so views it as disciplinary.

11.) On April 26, 2001, the plaintiff is turned away from the PIP meeting because he shows up accompanied by a co-worker, Bela Hasek. He contacts his then attorney, believing that his so-called Weingarten rights have been violated. He wants to file a charge with the NLRB. He is told that he can pursue that issue with the National Labor Relations Board subsequently, but that he "shouldn't get himself fired over it."

12.) The plaintiff meets with Mr. Jackson on May 1, 2001. After some back and forth between the plaintiff and Mr. Jackson, a PIP meeting is set for the next day.

13.) The plaintiff yields to the defendant's demand that he appear alone at the next day's PIP meeting. He makes it clear beyond peradventure that he will attend the PIP meeting, alone, as demanded by Mr. Jackson, but that he had the right to pursue the issue subsequently.

14.) The plaintiff has bowed to Mr. Jackson's demand that he appear the next day for the PIP meeting alone, stating repeatedly that he would do so. He declines, however, to profess, to proclaim, to agree with Mr. Jackson that he, Sultan, is wrong on the issue and the defendant right. He is thereupon fired.

15.) After nearly twenty years on the job, the plaintiff is fired, ostensibly for this weak brew labeled "insubordination," for merely saying that although he would attend the next day's PIP meeting alone, as demanded by Mr. Jackson, he still believed that he was right and that he had the right to pursue a legal remedy subsequently.

16.) During that private meeting with Mr. Jackson on May 1, 2001, the plaintiff was polite and soft-spoken; he was never belligerent or disrespectful; he agreed to attend the next

3

day's PIP meeting without a co-worker being present.

Thus:

A jury could fairly conclude that Mr. Jackson, present at the above-described Pearl River, N.Y., meeting, was executing the explicit desires of his boss, Mr. Merkis, whose statements to the plaintiff strongly smack of age bias, to get rid of the plaintiff.

A jury could fairly conclude that the ostensible reason for the plaintiff's firing was a pretext for age discrimination and that a discriminatory animus existed.

<u>Controlling Law</u>

"Evidence of discriminatory motive is elusive and rarely is established by other than circumstantial evidence... the jury must weigh the credibility of conflicting explanations." <u>Blare v. Husky Injection Molding Sys.</u>, 419 Mass. 437, 439 (1995).

The "entire purpose of the ... prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." Price Waterhouse v. Hopkins, 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed. 2d 268 (1989) (plurality opinion) (O'Connor, J., concurring).

"The ultimate issue of discrimination, raised by the parties' conflicting evidence as to the defendants' motive, is not for a court to decide on the basis of briefs and transcripts, but is for a fact finder after weighing the circumstantial evidence and assessing the credibility of witnesses." <u>Lipchitz v. Raytheon</u>, 434 Mass. 493, 499 (2001); <u>Labonte v. Hutchins and Wheeler</u>, 424 Mass. 813 at 820; <u>Flesner v. Technical Communications Corp.</u>, 410 Mass. 805, 509 (1991).

"In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind... Permitting, but not requiring the fact finder to draw the

4

inference strikes the proper balance by holding the plaintiff to her ultimate burden without

requiring her to produce direct evidence of discriminatory animus, a form of evidence that, we

recognize, rarely exists... That inference, combined with the evidence adduced to meet the

employee's burden of proof under the first stage of *McDonnell Douglas,* permits the fact finder to

conclude that the employee has satisfied her ultimate burden of proving that the decision was

made "because of" the unlawful discrimination as G.L.c. 151B, s. 4(1) requires." Lipchitz v.

Raytheon, 434 Mass. 493, 501 (2001) (internal citations omitted)

   Unlawful bias on the part of a specific decision maker may be inferred from the attitudes of

others in authority in the company, such as company officials and senior managers. Northeast

Metro. Reg'l Vocational Sch. Dist. Sch. Comm. v. MCAD, 31 Mass. App. Ct. 84, 99, 575 N.E.

2d 77, 81-82, cert. denied, 411 Mass. 1103, 579 N.E.2d 1361 (1991); Buckley Nursing Home v.

M.C.A.D., 20 Mass. App. Ct. 172, 176, 478 N.E.2d 1292, 1295-96, cert. denied, 395 Mass. 1103,

482 N.E.2d 328 (1985).

   Article 23 of the Universal Declaration of Human Rights provides that everyone "has the right

to work, to free choice of employment, to just and favorable conditions of work and to protection

against unemployment."

Response to Defendant's Arguments

I. That the complaint is untimely

   It is his firing on May 1, 2001 that brings the plaintiff to this forum. Verizon points to the

plaintiff's answer to the defendant's Interrogatory # 8, suggesting that the plaintiff is indifferent

to his firing and concerned solely with earlier events. Verizon neglects to call the Court's

attention to the answer the plaintiff provided to the very next interrogatory, # 9, (Affidavit of

Plaintiff's Counsel, Exhibit A) which specifically directed his attention to his termination:

9. State the basis of your claim that Verizon and/or Merkis **unlawfully terminated your employment** with Verizon. (Emphasis supplied)

A9. I did not, after over eighteen years on the job, suddenly become sloppy, ineffective and uninformed overnight. Nor was I ever insubordinate, which was the given reason for my firing. I politely pressed my right to have a co-worker present at the so-called PIP meeting that Mr. Jackson had told me to attend (not just any co-worker, but a co-worker who was my previous team leader under the period that I was being appraised and by Verizon's own company polices had a right to give input to the PIP process). I never refused to attend such a meeting, with or without a co-worker present, nor was I ever loud, belligerent or inappropriate. Workers who had, in fact, engaged in grossly inappropriate behavior (stealing examinations, threatening a co-worker with a weapon or being repeatedly tardy or absent due to drinking to excess) were not summarily terminated and most went unreprimanded. However, **older, long time W-2 workers such as myself, Bela Hasek and Earl Hinkley, who received high salaries and substantial benefits, were pushed out in favor of DTIG contract workers**, to whom Verizon need make no long term commitments and who built up no tenure or other entitlements. (Emphasis supplied)

In reference to earlier incidents which the plaintiff posited as contended evidence of age bias, "... whether independently actionable or not, [earlier] statements and acts may be used as evidence bearing on the motivation of the defendants in the actionable time period."Vesprini v. Shaw Industries, Inc., 00-11311-NG (May 3, 2002, Gertner, J.)

Prior to the events of May 1, 2001, the plaintiff did not know, and could not have known, that his employment was being terminated.

6

A complaint before the Massachusetts Commission Against Discrimination was filed on October 31, 2002 and the suit in this matter was filed in the Suffolk Superior Court on April 30, 2004, both within the time limits set out in G.L.c. 151B, s. 9 (six months from accrual of the cause of action for the MCAD complaint and three years for a suit).

The plaintiff's claim for wrongful termination is not untimely.

II. That the claim is preempted

The defendant itself asserts that the plaintiff was fired for insubordination, not for exercising his so-called "Weingarten rights".

The plaintiff believed that these rights (to have a co-worker present during an investigatory or disciplinary meeting) were violated on April 26, 2001 when he was turned away from the PIP meeting because he was accompanied by a co-worker. He contacted his then attorney that very day. He wanted to file a charge with the NLRB over the events of April 26, 2001. He was advised that he could pursue this claim subsequently but "not to get himself fired over it." (Plaintiff's Affidavit, paragraph 15)

He was not fired on April 26, 2001 when he refused to attend the PIP meeting without a co-worker present. (Plaintiff's Affidavit, paragraph 14)

He was fired on May 1, 2002 and not for asserting his Weingarten rights, because he was no longer asserting them. (Plaintiff's Affidavit, paragraph 18)

In its brief (page 13), Verizon states: "Although both Conte and Jackson informed Sultan multiple times that they would not honor his request, Sultan continued to insist that he had the right to have a co-worker present, and **after significant back and forth between Sultan and Jackson regarding this issue** on May 1, 2001, Jackson terminated Sultan's employment for

7

insubordination." (Emphasis supplied)

Again, on page 17 of its brief, Verizon contends: "Then on May 1, 2001, Sultan was presented with a letter warning him that his continued refusal to participate without a representative would result in his termination. **Rather than back down**, Sultan continued to insist that he had the legal right to have a Weingarten representative. Sultan reiterated this position, even after Jackson told him that he had no right to a representative and, **unless he agreed, he would be terminated**. When Sultan refused to agree, Jackson terminated him for insubordination." (Emphasis supplied)

It is in just such "back and forth" that the dispositive issue of credibility resides, waiting for resolution by a jury.

In fact, on that date the plaintiff unequivocally "backed down".

The plaintiff explicitly yielded to Verizon's demand that he appear alone the next day for the PIP meeting. He repeatedly made it clear that he would comply with his employer's demand. (Plaintiff's Affidavit, paragraphs 18, 18 & 20)

Verizon could and did demand that he not be accompanied by a co-worker and the plaintiff acceded to this demand. The plaintiff was not obligated, however, to profess that this was right, that he was wrong and Verizon correct on the matter; he had given his employer its entire due.

When first told that he must submit to the PIP process, Mr. Sultan believed he was being set up for termination because of his age (with good reason, given the outrageous, ageist comments directed at him personally by Mr. Jackson's immediate boss, in Mr. Jackson's presence). James M. Sultan, from Boykin, Alabama, was not looking to lose his job; he had a wife and children to support. (Plaintiff's Affidavit, paragraph 12, 13)

Both the defendant and the plaintiff contend that the plaintiff was fired for alleged

8

insubordination, not for refusing to attend the PIP meeting set for May 2, 2001 without a representative. The plaintiff contends that his alleged insubordination consisted of no more than his not professing himself to be wrong even while he acceded to Verizon's demand that he appear alone at the next day's PIP meeting. He believed then and believes now that he was not insubordinate and that the allegation that he was masks an unlawful, discriminatory intent, and effected the goal of Bruce Merkis to see the plaintiff gone.

The plaintiff's NLRB Charge Against Employer (Plaintiff's Affidavit, Exhibit A) stated: "On 4/26 we met along with my co-worker whom they asked to leave. On 5/1 I was called to a room terminated as of 5/1/2001. Verizon Communcations violated the NLRA by depriving me of my protective right to representation under Epilepsy Foundation." The charge is clearly predicated on the plaintiff being turned away from the April 26th PIP meeting because he showed up accompanied by a co-worker.

The plaintiff did not contend that he was fired for asserting his Weingarten rights, because he had yielded to Verizon's demand that he appear alone at the morrow's PIP meeting. He believed that the basis for the firing was his alleged insubordination, which consisted of no more than his not agreeing with Mr. Jackson that Verizon was correct on the matter. He believed that Mr. Jackson had expected him to continue to refuse to attend the PIP meeting alone and was taken aback when he, Sultan, yielded on this point. His alleged insubordination consisted of no more than his unwillingness to concede that Verizon was right, which he believed was a fallback pretext for getting rid of him, in conformance with Bruce Merkis' stated animus and goal of getting rid of the plaintiff.

The position statement (Plaintiff's Affidavit, Exhibit B) submitted to the NLRB by Amy D.

9

Seifer, counsel for Verizon, does not even mention the plaintiff's firing. The sole issue addressed is whether Verizon was within its rights to turn away the plaintiff from the April 26, 2001 PIP meeting because he showed up with a co-worker.

Consistent with his belief that his firing for alleged insubordination was a pretext for unlawful discrimination, the plaintiff stated in his MCAD filing that "[t]he **reason stated to me** [for his termination] was insubordination because I requested a co-worker to attend a meeting to discuss my alleged performance issue and performance improvement plan. **I believe** I have been a victim of unlawful employment discrimination because of my race, Black, and religion, Muslim... and because of my age..." (Plaintiff's Affidavit, Exhibit A, emphasis supplied)

Subsequently, after a Lack of Probable Cause finding by the MCAD, the pro se plaintiff did complain in writing to the MCAD that he had been denied an opportunity to amend his complaint before the Commission. He wanted to add that he was denied his Weingarten rights "and" was wrongfully terminated. His proposed amendment did not retract the explicit bases advanced in the original MCAD complaint: race, religion and age. (Plaintiff's Affidavit, paragraph 21)

As the plaintiff testified at his deposition:

A. My age is the end result. The end result is to get rid of me. To get rid of me, you can't just fire me without a legal parameter, so they have to make me seem incompetent. They have to put me on a process. They have to say I don't know this and that. Haskek invalidates that with his testimony. (Plaintiff's Deposition, Vol. II, page 113; see Affidavit of Plaintiff's Counsel, Exhibit B)

The cold, narrow issue for the NLRB was whether a manager/ employee such as the plaintiff had the right to the presence of a co-worker at a Performance Improvement Plan meeting; it ruled

10

that he did not.

Whether the events of May 1, 2001 evidenced discrimination in employment under Massachusetts law is of "peripheral concern" to Federal labor policy. Chaulk Ambulance, cited by Verizon, concerned allegations of interference with union activities, a matter of far greater concern to Federal labor policy.

"...due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act... Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." San Diego Building Trades Council v. Garmon, 359 U.S. 236, 243-244 (1959) (citations omitted)

The NLRB ruling was that the plaintiff did not have a right to have a co-worker present at a PIP meeting; it did not even purport to address the question before this Court, whether the defendant's contention that the plaintiff was fired for insubordination was a pretext for age discrimination.

Disagreement about Weingarten rights was certainly part of the background to the case at bar, in the events leading up to the plaintiff's termination for alleged insubordination. Whether Mr. Sultan's alleged insubordination was a pretext for age discrimination, however, is very much an interest "so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, courts cannot infer that Congress has deprived the states of the power to

act." Garmon, supra, at 243. The determination of whether the plaintiff was the victim of age discrimination is not "so plainly within the central aim of federal regulation [that it] involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." Garmon, supra, at 244.

Massachusetts has expressed its local feeling about discrimination and has taken responsibility by enacting comprehensive legislation, G.L.c. 151B, specifically intended to combat discrimination in employment on the basis, inter alia, of age. The issue of the plaintiff's firing on May 1, 2001 implicates a significant state interest in remedying such discrimination.

III. That the plaintiff cannot make out a prima facie case

The defendant then contends that since the plaintiff was not replaced by a younger worker, he cannot make out a prima facie case.

This is a.) not the case, and b.) not the law.

Mr. Sultan trained numerous, younger contract workers in the months before his termination, who continued on after his firing. Plaintiff's Affidavit. See also Montlouis v. Pirus Networks, Inc., 19 Mass.L.Rptr.277, 2005 WL 1009523 (Mass.Super., 2005) (Gants, J.): "As to the fourth element, while the record is clear that no new employee was hired to replace Montlouis, there is evidence that his work was performed by other engineers, primarily Schofer, who had qualifications similar to Montlouis."

Verizon contends (Jackson Affidavit, paragraph 4) that Verizon was "in the process of reducing headcount..."

The Affidavit of Bela Hasek is filed herewith. In paragraph 10 thereof, Mr. Hasek states:

In early February of 2001, I entered a cubicle having been asked to work on a problem

with a computer. In the next cubicle was Harvey Jackson. I overheard his half of a

telephone conversation in which James Sultan's name was mentioned. Mr. Jackson's half

of the conversation included the following:

"Sultan is at his mosque again." (It was a Friday)

"No, we don't want to get into religion."

"Let's just pursue the PIP process... that's our best bet for getting rid of him."

Thus, "...consistent with the purpose of the prima facie case, and joining the majority of other

jurisdictions, we conclude that a plaintiff in a reduction in force case may satisfy the fourth

element of her prima facie case by producing some evidence that her layoff occurred in

circumstances that would raid a reasonable inference of unlawful discrimination." Sullivan v.

Liberty Mutual Insurance Co., 444 Mass. 34, 825 N.E.2d 522, 533-534 (2005).

The comments directed to the plaintiff by Mr. Merkis, the comments of Mr. Jackson and the

slim pretext of insubordination raise such an inference.

IV. That Verizon had a legitimate reason for firing the plaintiff

This is ultimately a jury question. "While Pirus vigorously contends that Mountlouis did not

perform his job acceptably, there remains here, as in virtually every employment discrimination

case, a genuine issue of material fact as to whether Montlouis' work performance was

acceptable." Montlouis, supra, at 5. See Affidavit of Bela Hasek, paragraph 8. A jury could find

that the plaintiff was a talented, conscientious worker for nearly two decades, one who received

regular raises, bonuses and promotions. See Affidavit of Plaintiff, paragraph 22, Exhibit C. A

jury could find that having extracted the plaintiff's agreement to attend the PIP meeting the next

day without a co-worker, Mr. Jackson had the wind taken out of his sails, that he had expected

13

the plaintiff to refuse to accede to that demand, which would have given him a justification for

the plaintiff's termination. A jury could find that having bowed to his employer's demand that he

attend the next day's PIP meeting alone, the plaintiff was far from insubordinate merely for not

professing that he was wrong and Verizon right. A jury could find that this alleged

insubordination was a pretext for the firing of the plaintiff in conformance with the ageist

remarks and malign intentions shamelessly uttered by Bruce Merkis to the plaintiff, in the

presence of Mr. Jackson at the Pearl River meeting and Mr. Jackson's own remarks, as overheard

by Bela Hasek.

V. That Verizon was not the plaintiff's employer

   Exhibit B of the Plaintiff's Affidavit is the position statement submitted to the NLRB by Amy

D. Seifer, counsel for Verizon, in response to the plaintiff's complaint. It opens: "Verizon

Communications, Inc. ("the Company") submits this position statement in the above-referenced

case."  Under the heading Factual Background, Atty. Seifer explicitly stated: "**James Sultan was

employed by Verizon as a Systems Engineer**." (Emphasis supplied). The severance offer made

to the plaintiff was sent him on Verizon stationery. (Plaintiff's Affidavit, Exhibit D).  The

plaintiff's appraisals were adorned with the Verizon logo. (Plaintiff's Affidavit, Exhibit E).

   By its conduct and express representations, it is clear Verizon treated the plaintiff as

its employee and he reasonably so considered himself. Estoppel is based upon notions of fair

dealing and good faith and is employed to prevent the inequitable assertion of rights which would

otherwise exist to the detriment of an opposing party who has been misled. In re Collier, 307

B.R. 20, 27 (Bkrtcy.D.Mass., 2004) (citations omitted). A trier of fact could easily conclude that

Verizon's dealings and communications with the plaintiff during his employment amounted to

representations that he was its employee. "'Conduct' may include spoken words, written words, positive acts, silence and negative ommission to do something. To find estoppel, there need not be an actual intent to defraud or mislead. The estopped party need only have intended or expected that another would act based upon his representations." Collier, supra, at 28, citing In re DeArakie, 199 B.R. 821, 827 (Bankr.S.D.N.Y.1996).

Response to Defendant's Statement of Uncontested Facts

Pursuant to Local Rule 56.1, the plaintiff disputes the following assertions included in the Defendant's Statement of Undisputed Material Facts:

Defendant's Assertion: Sultan then reiterated his request to have a co-worker present.

Plaintiff's response: Incomplete. The plaintiff's full answer was:

"I reiterated my request telling him I had a right to request and I reiterated to him that I will be there and I will be there tomorrow alone but I was going to pursue it after. That's what I was telling him." (Plaintiff's Deposition, Vol. II, page 50; see Affidavit of Plaintiff's Counsel, Exhibit B)

Defendant's Assertion: Sultan and Jackson went back and forth about this issue until Jackson told Sultan that he was terminated in insubordination.

Plaintiff's response: Incomplete. The plaintiff's full answer was:

A. After I said, "I still have the right," Harvey [Jackson] said something about, "You don't have the right. Maybe something similar to that.

Q. After Mr. Jackson said, "You don't have the right," who said what next?

A. I told him – like I say again, I told, "Well, I'll be there on 5/2 and I will be there alone,

15

but I still have the right." And he knew what "the right" means, that I was going to pursue. I was going to pursue that. I still have the right to pursue. Even though I comply, he can't stop me from pursuing.

Q. Okay. After you said that, who said what next?

A. Well, Harvey got agitated and he said, "You are terminated for insubordination." And I really didn't believe he had said that. I was kind of like shocked. (Plaintiff's Deposition, Vol. II, pages 58-59; see Affidavit of Plaintiff's Counsel, Exhibit B)

Defendant's Assertion: After his termination, Sultan was never replaced. At the time the business unit was in the process of reducing headcount. Thus, when Sultan was terminated, there was no need to replaced him.

Plaintiff's response: Not so. Plaintiff had unwittingly been training his replacements, younger contract workers, who remained with Verizon after the plaintiff was fired. See Plaintiff's Affidavit, paragraph 22; see Affidavit of Bela Hasek, paragraph 12. See also the following exchange, which is contrary to defendant's characterization of the plaintiff's testimony:

Q. After you were terminated, there was a group layoff, correct?

A. I have no knowledge of that.

Q. Can you tell me – do you know who did your work after you were let go?

A. My work was done by the same person who did it before I was let go.

Q. Who was that?

A. That was Bill Driscoll and other contractors. (Plaintiff's Deposition, Vol. II, pages 115 - 116; Plaintiff's Counsel's Affidavit, Exhibit B)

16

Defendant's Assertion: Sultan believed that Verizon had violated the Act by denying his request for a representative and then terminating him.

Plaintiff's response: Plaintiff's believed that his Weingarten rights were violated on April 26, 2001, when he was not permitted to have a co-worker attend the PIP meeting with him. Then, so as not to lose his job, on May 1st he advised Harvey Jackson that he would comply with the demand that he attend the PIP meeting, rescheduled to May 2d, alone. He was terminated for alleged insubordination because he would not concede that he had no right to have a co-worker present. (Plaintiff's Affidavit; see also Plaintiff's Deposition, Vol. II, pages 58-59, above; see Affidavit of Plaintiff's Counsel, Exhibit B)

Further, the deposition testimony cited by the defendant is not clear:

Q. ... You filed a charge alleging that Verizon had violated the National Labor Relations Act, correct?

A. Yes.

Q. And that was because they denied your request for a representative and terminated you?

A. Yes, they terminated me. (Plaintiff's Deposition, Vol. II, page 86; see Affidavit of Plaintiff's Counsel, Exhibit B)

See also the following exchange:

Q. You understand that Mr. Jackson claims that he terminated you for insubordination? Do you understand that?

A. I understand he said it, if that's what you are asking me.

Q. And you understand that Mr. Jackson – his assertion was that you were insubordinate

17

by insisting upon a Weingarten representative; isn't that correct?

      A. That is not correct. I did not insist.

      Q. Ignoring the "insist" part, I ask you whether that's Mr. Jackson's position.

      A. Mr. Jackson's position is that I didn't have the right to ask. (Plaintiff's Deposition, Vol. II, pages 110-111; see Affidavit of Plaintiff's Counsel, Exhibit B)

Defendant's Assertion: As set forth [in plaintiff's answer to interrogatory # 8], Sultan did not identify his termination as underlying his claim of age discrimination.

Plaintiff's response: Incomplete. The very next interrogatory addressed the termination:

      9. State the basis of your claim that Verizon and/or Merkis **unlawfully terminated your employment** with Verizon. (Emphasis supplied)

      A9. I did not, after over eighteen years on the job, suddenly become sloppy, ineffective and uninformed overnight. Nor was I ever insubordinate, which was the given reason for my firing. I politely pressed my right to have a co-worker present at the so-called PIP meeting that Mr. Jackson had told me to attend (not just any co-worker, but a co-worker who was my previous team leader under the period that I was being appraised and by Verizon's own company polices had a right to give input to the PIP process). I never refused to attend such a meeting, with or without a co-worker present, nor was I ever loud, belligerent or inappropriate. Workers who had, in fact, engaged in grossly inappropriate behavior (stealing examinations, threatening a co-worker with a weapon or being repeatedly tardy or absent due to drinking to excess) were not summarily terminated and most went unreprimanded. However, **older, long time W-2 workers such as myself, Bela Hasek and Earl Hinkley, who received high salaries and substantial**

18

**benefits, were pushed out in favor of DTIG contract workers**, to whom Verizon need make

no long term commitments and who built up no tenure or other entitlements. (Emphasis supplied)

(See Affidavit of Plaintiff's Counsel, Exhibit A)

Plaintiff's Statement of Undisputed Material Facts

1.) On May 1, 2001, the plaintiff made clear to Harvey Jackson that he would attend the PIP

meeting scheduled for the next day alone. (Plaintiff's Deposition, Vol. II, pages 49, 50, 53, 54,

55, 58,59, 75, 76 and 77; Plaintiff's Affidavit, paragraphs 18, 18 & 20)

2.) The plaintiff's alleged insubordination was his refusal to agree that he was wrong about his

right to have a representative present at the PIP meeting and Verizon was right. (Plaintiff's

Deposition, Vol. II, pages 58-59; Plaintiff's Affidavit, paragraph 18, 19 & 20)

3.) The plaintiff was polite, soft-spoken and never belligerent or rude during his May 1, 2001

meeting with Harvey Jackson. (Plaintiff's Affidavit, paragraph 19)

4.) During the plaintiff's eighteen years or more with the defendant or its corporate predecessors,

he received regular raises and bonuses, was never disciplined and took advantage of the

opportunities afforded him by his employers to take courses to keep himself current with the

latest technology. (Plaintiff's Affidavit, paragraph 2, Exhibit C)

Plaintiff's Exhibits (filed manually)

Exhibit 1: Plaintiff's Affidavit, with exhibits.

Exhibit 2: Affidavit of Bela Hasek.

Exhibit 3: Affidavit of Plaintiff's Counsel, with exhibits.

Conclusion

    As material facts remain in dispute, the defendant's Motion for Summary Judgment should be

denied.

Respectfully submitted,
the plaintiff,
James M. Sultan,
by his attorney:

/s/ Gregory R. Barison
_____
Gregory R. Barison
Weston Patrick, P.A.
84 State Street / 11th Floor
Boston, MA 02109
(617) 742-9310
BBO # 029340

January 18, 2007

<u>Certificate of Service</u>

I, Gregory R. Barison, certify that on January 18, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to defendant by electronically serving it counsel of record.

/s/ Gregory R. Barison

20