UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

JAMES M. SULTAN,

Plaintiff,

v.

VERIZON SERVICES GROUP,

Defendants.

CIVIL ACTION No. 04 CV 11107 MLW

AFFIDAVIT OF ROBERT A. FISHER IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE TO
PRECLUDE PLAINTIFF'S EXPERT FROM TESTIFYING

I, Robert A. Fisher, do hereby depose and say as follows:

1.    I am member in good standing of the bar of the Commonwealth Massachusetts
and the bar of the U.S. District Court of Massachusetts.  I am counsel of record for Defendant
Verizon Services Group in the above-referenced matter and submit this affidavit in support of
Defendant's Motion in Limine.

2.    Attached hereto at Exhibit A is a true and correct copy of Plaintiff's First
Supplemental Answers to the Defendant's Interrogatories, which enclosed the curriculum vitae
of Edward P. Berger and a memorandum from Berger dated February 22, 2006.

3.    Attached hereto at Exhibit B is a true and correct of excerpts from Volume I of
the deposition of James M. Sultan.

Signed this 1st day of May 2007 under the pains and penalties of perjury.

Robert A. Fisher

<u>CERTIFICATE OF SERVICE</u>

     I, Robert A. Fisher, certify that on May 1, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to plaintiff by electronically serving his counsel of record.

s/ Robert A. Fisher _____

**Exhibit A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES SULTAN,

       Plaintiff

v.

VERIZON COMMUNICATIONS, INC.,

       Defendant

CIVIL ACTION
NO. 04-11107-MLW

PLAINTIFF'S FIRST SUPPLEMENTAL ANSWERS TO THE DEFENDANT'S
INTERROGATORIES

6. Please identify all persons whom you expect to call as an expert witness at trial or other
hearing in this matter, and for each state (a) the person's qualifications or expertise, (b) the
subject matter on which such person is expected to testify, (c) the substance of all facts and
opinions to which such person is expected to testify and (d) a detailed summary of the grounds
for each such opinion, including the identify of each document upon which such person has
relied or expected to rely in formulating such opinion.

Original Response:

A6. It has not yet been determined if expert testimony will be offered on my behalf. I understand
that I have an obligation under the Rules of Civil Procedure and court orders to supplement this
answer in a timely fashion.

**Supplemental Response:**

   The plaintiff will offer the expert testimony of Edward P. Berger, whose curriculum vitae is
attached hereto. Mr. Berger will testify as to his calculations of income the plaintiff lost due to
the termination of his employment with the defendant on May 1, 2001. He is expected to testify
in accordance with his report, which is also attached hereto.

Signed under the pains and penalties of perjury:
James M. Sultan:
date: 2/25/06

Respectfully submitted,

_____
Gregory R. Barison
BBO # 029340

Weston Patrick
84 State Street, 11th Floor
Boston, MA 01209
(617) 742-9310

date: February 25, 2006

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon (each
party appearing pro se and) the attorney
of record for each (other) party by mail
(by hand) on   2-25-06

_Barison_
GREGORY R. BARISON

EDWARD P. BERGER

3 School Street
Boston, Massachusetts 02108
(617) 227 - 4900

## EDUCATION

| | |
|---|---|
| 1954 - 1959 | DUKE UNIVERSITY<br>M.A., 1959, in mathematics. Graduate fellowship.<br>B.S., 1958, in chemistry / mathematics. |
| Summer 1961 | AMERICAN UNIVERSITY<br>National Science Foundation Institute |
| 1965 - 1967 | KANSAS STATE UNIVERSITY<br>Ph.D. candidate, mathematical statistics |
| Spring 1978 | FORD FOUNDATION<br>Business and The Media Institute |

ACADEMIC HONORS:

DUKE UNIVERSITY - Graduate fellowship in mathematics
AMERICAN UNIVERSITY - National Science Foundation
THE SOCIETY OF SIGMA XI - Graduate research honorary
PI MU EPSILON - Mathematics honorary

## EXPERIENCE

MATHEMATICS INSTRUCTOR

| | | |
|---|---|---|
| 1965 - 1967 | KANSAS STATE UNIVERSITY | Manhattan, KS |
| 1963 - 1965 | THE JOHNS HOPKINS UNIVERSITY | Baltimore, MD |
| 1960 - 1964 | UNITED STATES NAVAL ACADEMY | Annapolis, MD |
| 1959 - 1960 | UNIVERSITY OF NEVADA | Las Vegas, NV |

PENSION
VALUATOR

Accepted as an EXPERT WITNESS by the following probate courts in Massachusetts and New Hampshire:

1984 - present

| | |
|---|---|
| Norfolk County | Essex County |
| Middlesex County | Suffolk County |
| Plymouth County | Bristol County |
| Worcester County | Barnstable County |
| Rockingham County (NH) | Hillsborough County (NH) |

Appointed SPECIAL MASTER by Bristol County and Norfolk County Probate Courts for purpose of preparing QDROs and orders for assigning payments from a Deferred Compensation Plan.

Resume of Edward Berger

| | |
|---|---|
| **FINANCIAL REPORTER** | Write and deliver syndicated daily analysis of stock market activity and special reports on money topics for the following radio stations: |

1974 - 1994

| | | | |
|---|---|---|---|
| WABK | Augusta, ME | WGIR | Manchester, NH |
| WADK | Newport, RI | WHDH | Boston, MA |
| WBSM | New Bedford, MA | WHEB | Portsmouth, NH |
| WCAP | Lowell, MA | WJAR | Providence, RI |
| WCCM | Lawrence, MA | WSRS | Worcester, MA |
| WEEI | Boston, MA | WBOQ | Beverly, MA |

1979 - 1980    Daily financial reports for the 6 p.m. news and special programs on money, business and tax topics for

WBZ-TV Boston, MA

| | |
|---|---|
| **MARKETING CONSULTANT** | Write and produce newsletters, reports, and client seminars for the following institutions |

1981 - 1994

| | |
|---|---|
| BANK OF NEWPORT | Newport, RI |
| THE BOSTON FIVE CENTS SAVINGS BANK | Boston, MA |
| NEW BEDFORD FIVE CENTS SAVINGS BANK | New Bedford,MA |
| KIDDER, PEABODY & CO. | Boston, MA |
| MALMART MORTGAGE COMPANY | Brookline, MA |
| NUMERICA SAVINGS BANK | Manchester, NH |
| SALEM FIVE CENTS SAVINGS BANK | Salem, MA |
| SOUTHEAST BANK FOR SAVINGS | Dover, NH |
| BANK OF NEW ENGLAND (NORTH) | Lowell, MA |
| BANK OF NEW ENGLAND (ESSEX) | Peabody, MA |
| WAKEFIELD SAVINGS BANK | Wakefield, MA |
| LEE SAVINGS BANK | Lee, MA |
| AMOSKEAG BANK | Manchester, NH |
| BAY STATE SAVINGS BANK | Worcester, MA |
| THE LOWELL FIVE | Lowell, MA |

**STOCKBROKER**

| | | |
|---|---|---|
| 1975 - 1978 | WHITE WELD & COMPANY | Boston, MA |
| 1967 - 1975 | MERRILL LYNCH, PIERCE, FENNER & SMITH | Boston, MA |

**PERSONAL DATA**    Excellent health. Married, two sons. Sports: squash and sailing. Honorary and volunteer activities:

Member, Duke University (National) Alumni Board
Past President, Duke Alumni Assn. of Boston, MA
Member, Massachusetts Bar Association
Sponsor Member, Massachusetts Continuing Legal Education
Member, Senior Partners for Justice
Overseer, New England Conservatory of Music
Member, MBTA Advisory Board
Trustee, Economic Education Council of Massachusetts
Director, North Shore Community College Foundation
Director, Harbor Advisory Corp., Portsmouth, NH
Director, Gloucester Stage Company, Gloucester, MA
Who's Who in Science and Engineering
Member Finance Committee, Manchester (MA) Yacht Club

**Ed Berger & Company**

3 SCHOOL STREET
BOSTON, MASSACHUSETTS 02108

To:   Gregory R. Barison, Esquire
      Weston, Patrick, Willard & Redding
      84 State Street
      Boston, MA 02109-2299

From: Edward P. Berger
      3 School Street                    (617) 227-4900
      Boston, MA 02108

Subj: Lost income analysis due to James M. Sultan's
      termination of employment with Verizon on 5/1/2001.

Date: February 22, 2006


**FACTS:**

1.    James M. Sultan's date of birth is February 14, 1949 –
      making him 57.02 years of age on February 22, 2006.

2.    Mr. Sultan's basic compensation and bonus totaled
      $ 79,885 for the calendar year 2000 (the full year
      preceding his termination from Verizon).

      For the year 2000,

            Basic Compensation:      $ 74,300

            Bonus and Incentive:     $  5,585

                  Total             $ 79,885


3.    In the analysis which follows, we shall consider the
      following three cases regarding the possible growth of
      his income after his termination of service.

            Case I:    Assuming that his 2000 Income ($ 79,885)
                       remains unchanged  up to age 65
                       (3/1/2014) – at which point he retires.

            Case II:   Assuming that his 2000 Income ($ 79,885)
                       grows at a 2% annual rate up to age 65
                       (3/1/2014) – at which point he retires.

            Case III:  Assuming that his 2000 Income ($ 79,885)
                       grows at a 3% annual rate up to age 65
                       (3/1/2014) – at which point he retires.

METHODOLOGY:

For each case listed above, we shall compute the Present Values for

    a.   Mr. Sultan's "Lost <u>Past Income</u>" for the period from 5/1/2001 to 3/1/2006, where each "Lost" payment (payments not received from 5/1/2001 to 3/1/2006) is presumed to have been invested at the indicated growth rate (0%, 2% and 3%) until 3/1/2006,   and

    b.   Mr. Sultan's "Lost <u>Future Income</u>" for the period from 3/1/2006 to 3/1/2014 (age 65), where each "Lost" future payment (payments that will not be received after 3/1/06) will be <u>discounted</u> to adjust for the time value of money (at 3%, 4% and 5%).

CALCULATIONS:

A.   For "Lost Income" (Past, Future and Total),
using a <u>**3% DISCOUNT RATE**</u>:

## PRESENT VALUES

| Annual Growth Rate vs. 2000 | Monthly Income <u>March</u> <u>2006</u> | Lost <u>PAST</u> Income 5/01-3/06 <u>(4.83 yrs)</u> | + | Lost <u>FUTURE</u> Income 3/06-3/2014 <u>(3% Discount Rate)</u> | = | TOTAL Lost Income <u>Past+Future</u> |
|---|---|---|---|---|---|---|
| 0% Grth | $ 6,657 | $ 386,108 | + | $ 567,547 | = | $   953,655 |
| 2% Grth | $ 7,332 | $ 405,032 | + | $ 677,116 | = | $ 1,082,148 |
| 3% Grth | $ 7,694 | $ 414,947 | + | $ 739,513 | = | $ 1,154,460 |

Ed Berger & Company

B.   For "Lost Income" (Past, Future and Total),
        using a **4% DISCOUNT RATE**:

## PRESENT VALUES

| Annual Growth Rate vs. 2000 | Monthly Income March 2006 | Lost PAST Income 5/01-3/06 (4.83 yrs) | + | Lost FUTURE Income 3/06-3/2014 (4% Discount Rate) | = | TOTAL Lost Income Past+Future |
|---|---|---|---|---|---|---|
| 0% Grth | $ 6,657 | $ 386,108 | + | $ 546,143 | = | $   932,251 |
| 2% Grth | $ 7;332 | $ 405,032 | + | $ 651,579 | = | $ 1,056,611 |
| 3% Grth | $ 7,694 | $ 414,947 | + | $ 711,623 | = | $ 1,126,570 |

C.   For "Lost Income" (Past, Future and Total),
        using a **5% DISCOUNT RATE**:

## PRESENT VALUES

| Annual Growth Rate vs. 2000 | Monthly Income March 2006 | Lost PAST Income 5/01-3/06 (4.83 yrs) | + | Lost FUTURE Income 3/06-3/2014 (5% Discount Rate) | = | TOTAL Lost Income Past+Future |
|---|---|---|---|---|---|---|
| 0% Grth | $ 6,657 | $ 386,108 | + | $ 525,839 | = | $   911,947 |
| 2% Grth | $ 7,332 | $ 405,032 | + | $ 627,356 | = | $ 1,032,388 |
| 3% Grth | $ 7,694 | $ 414,947 | + | $ 685,168 | = | $ 1,100,115 |

Edward P. Berger

3

**Exhibit B**

1

Volume I
Pages 1 to 198
Exhibits 1 to 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
JAMES M. SULTAN,                  :
          Plaintiff,              :
                                  :
     vs.                          :   Civil Action No.
                                  :   04 CV 11107 MLW
VERIZON COMMUNICATIONS INC.,      :
          Defendant.              :
                                  :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF JAMES M. SULTAN, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Foley Hoag LLP, 155 Seaport
Boulevard, Boston, Massachusetts, on Thursday,
February 16, 2006, commencing at 10:08 a.m.

PRESENT:

     Weston Patrick
          (By Gregory R. Barison, Esq.)
          84 State Street, 11th Floor, Boston,
          MA  02109, for the Plaintiff.

     Foley Hoag LLP
          (Robert A. Fisher, Esq.)
          155 Seaport Boulevard, Boston, MA 02210,
          for the Defendant.

                    *  *  *  *  *

4

PROCEEDINGS

JAMES M. SULTAN

3    a witness called for examination by counsel for the

4    Defendant, having been satisfactorily identified by

5    the production of his driver's license and being

6    first duly sworn by the Notary Public, was examined

7    and testified as follows:

DIRECT EXAMINATION

9    BY MR. FISHER:

10    Q.    Good morning.

11    A.    Good morning.

12    MR. FISHER:  In an off-the-record

13    discussion, Mr. Sultan's counsel and I agreed to the

14    usual stipulations, meaning we'll hold all

15    objections, except as to form, and motions to strike

16    until trial.  And the witness will read and sign the

17    deposition, but waive notarization.  We also

18    agreed -- and, Greg, chime in if you need to -- that

19    there were several documents which the parties

20    dispute whether or not there was inadvertent

21    disclosure of privileged communications between the

22    plaintiff and his prior counsel.

23    The company will seek to file a motion with

24    the Court regarding the issue and will not use the

16

1    Wentworth?

2        A.    Civil engineering.

3        Q.    Was it an associate's?  Was it a bachelor's

4    degree?

5        A.    Associate's of science.

6        Q.    And when did you receive that degree?

7        A.    If I recall correctly, it would have been

8    1979.

9        Q.    Now, you said you also have a degree from

10   Boston University?

11       A.    Yes.

12       Q.    And that was a degree in computer science?

13       A.    Yes.

14       Q.    When did you receive that degree?

15       A.    It was before I started with Verizon, which

16   had to be before '83.  I would say it was '83.  It

17   was almost the same year I started with Verizon.

18       Q.    And was that an associate's degree or a

19   bachelor's degree?

20       A.    Associate's of science, computer science.

21       Q.    Are you currently employed?

22       A.    Yes, I am.

23       Q.    Who is your current employer?

24       A.    My current employer is Allied Barton,

1  B-A-R-T-O-N.  And I have a part-time job working for

2  a school program, METCO, administration program.

3       Q.   I take from your answer, that you have a

4  full-time job at Allied Barton?

5       A.   Yes.

6       Q.   What is your position there?

7       A.   I monitor security systems, monitors, take

8  phone calls, tell them which banks have different

9  problems.  I'm a contractor to the bank.  We can

10 move from job to job.  I work for Allied, but you

11 can go from a client to client.

12      Q.   I see.  Is there a particular location

13 where you work most of the time?

14      A.   Yes.

15      Q.   Where is that?

16      A.   That would be Two Morrissey Boulevard in

17 Dorchester.

18      Q.   And who do you report to?

19      A.   A gentleman by the name of Keith Berry,

20 K-E-I-T-H B-E-R-R-Y.

21      Q.   And do you have a title at Allied Barton?

22      A.   Security officer.

23      Q.   Now, is that a job -- do you work during

24 the days on that job or do you work at night?

18

1          A.    I work in the daytime.

2          Q.    Now, you said you also work part time with

3    METCO?

4          A.    Yes.

5          Q.    And what is that job?

6          A.    It's like help desk support, technical

7    support kind of stuff.

8          Q.    Do you have a job title?

9          A.    Not really.  I made up my own title.  It's

10   that loose of an organization.

11         Q.    What is the title you made up for yourself?

12         A.    Technical support.

13         Q.    And you said that was part time.  How many

14   hours a week do you work in technical support for

15   METCO?

16         A.    Normally four a day, which averages around

17   20 to 25 a week, depending.

18         Q.    So is this a job that you do in the

19   evenings or at night?

20         A.    Yes.  When I get off the day job, I do this

21   in the evening.

22         Q.    What is your current rate of pay at Allied

23   Barton?

24         A.    $12.50 per hour.

19

1      Q.    What about at METCO?

2      A.    $20 per hour.

3      Q.    And how long have you worked at Allied

4 Barton?

5      A.    This August 22nd will make three years.

6      Q.    So you started August 22, 2003?

7      A.    Yes.

8      Q.    And throughout that period of time, has it

9 been a full-time job?

10     A.    Yes.

11     Q.    What was your starting rate of pay at

12 Allied Barton?

13     A.    $11.50 an hour.

14     Q.    And how many raises have you received

15 there?

16     A.    The group only received one.  We get raises

17 at the same time.

18     Q.    When did you receive a raise from $11.50 to

19 $12.50 an hour?

20     A.    A month after I got there.  It was already

21 in place.

22     Q.    So you started on August 22, 2003.  And for

23 a month you were paid approximately $11.50 an hour;

24 is that correct?

20

1      A.    That's about it, yes.

2      Q.    And then thereafter, you were paid $12.50

3  an hour up through to today?

4      A.    Yes.

5      Q.    And how long have you worked for METCO?

6      A.    I started with METCO, if my memory is

7  serving right, it will be September 2005, last year.

8      Q.    So that's approximately six months or so?

9      A.    September --

10     Q.    Maybe a little less than that.

11     A.    Okay.  From September until now.

12     Q.    And have you always been paid -- I have to

13  go back and look at the amount -- $20 an hour?

14     A.    Yes.

15     Q.    Prior to your position at METCO, did you

16  hold any other second job while you were also

17  employed at Allied Barton?

18     A.    Say that again.

19     Q.    Sure.  As I understand it, you were

20  employed by Allied Barton from August 22, 2003

21  through today.

22     A.    Right.

23     Q.    You were employed by METCO from September

24  2005 or so through today?

1    A.    Right.

2    Q.    Prior to September of 2005, but while you

3  also were employed by Allied Barton, did you hold a

4  second job?

5    A.    Yes.

6    Q.    How many different second jobs have you

7  held?

8    A.    Since when?

9    Q.    Since the time when you started working for

10  Allied Barton?

11    A.    Counting METCO, I would say two second

12  jobs.

13    Q.    What was your other second job that you

14  held?

15    A.    I was a stock clerk at Stop & Shop.

16    Q.    How long did you work at Stop & Shop?

17    A.    It was only for a couple of months.  Maybe

18  a little longer, but not longer than a couple of

19  months.

20    Q.    And when did you work for Stop & Shop?

21    A.    I would say it was in 2004, if my memory is

22  serving right.

23    Q.    So sometime in 2004 you worked for a few

24  months at Stop & Shop?

1    A.    Right.

2    Q.    Did you work at a particular store?

3    A.    I was training at the Quincy store.

4    Q.    And was that a unionized position?

5    A.    Yes, it was.

6    Q.    And what did you make at Stop & Shop?

7    A.    $6.50 an hour.

8    Q.    Why did you leave Stop & Shop?

9    A.    They weren't conducive to human survival,

10   in the sense that they didn't treat you like a

11   person.

12   Q.    Let me ask you this:  Did you leave

13   voluntarily or were you terminated?

14   A.    I left voluntarily.

15   Q.    I take it -- am I correct in understanding

16   that you left because you didn't like the way they

17   treated you?

18   A.    I didn't think the way they treated people,

19   period, was humanly correct.  And I refused to exist

20   in an environment like that.

21   Q.    Can you give me some examples of what you

22   disliked about how they treated people at Stop &

23   Shop.

24   A.    There was no communication to vine out what

27

1    process?

2        A.    No.    "Make money" means profit.    If I spent

3    100 and I only make 80, I didn't make any money.

4        Q.    I see.    What would you have to spend money

5    on in order to sell product?

6        A.    You would have to buy brochures.    You would

7    have to pay for your online access.    You have to pay

8    your membership fee.    You have to pay for envelopes,

9    packaging material.    You have to pay for gas.    You

10   have to go to meetings.    So there's a lot of

11   expense.    And the expense was always greater than

12   the income.    I was operating at a deficit.

13       Q.    Other than your efforts through Quixtar,

14   your job at METCO and your job at Stop & Shop, did

15   you have any other employment while you were

16   employed by Allied Barton?

17       A.    Not while I was employed by Allied Barton.

18       Q.    Now, prior to your working for Allied

19   Barton, what other employment -- between the time

20   that you left Verizon and started working for Allied

21   Barton, what other employment did you have?

22       A.    I worked for a company called "PCF."

23       Q.    PCF?

24       A.    Yeah, Paul Charlie Frank.    And it stood for

28

1    public circulation -- I forgot the F.  It was a

2    telemarketing company for Boston Globe and the New

3    York Times newspaper.

4         Q.    And how long did you work there?

5         A.    I worked from the fall of 2002 until

6    late -- I think it was around the spring of 2003.

7         Q.    So somewhere in the range of six, seven

8    months or so?

9         A.    Yeah, somewhere like that, yeah.

10        Q.    Was this a full-time or a part-time job?

11        A.    Full-time.

12        Q.    And what was your rate of pay?

13        A.    The base was $10 an hour.

14        Q.    You say "base."  Was there a commission

15   program?

16        A.    There was a commission program, yes.

17        Q.    And how did the commission program work?

18        A.    It was based on how many papers you were

19   able to get customers to buy -- every paper that you

20   got a customer on the phone to buy, you would

21   receive a certain amount of commission to go to

22   that.

23        Q.    Are you talking about individual papers or

24   weekly subscriptions for newspapers?

197

1                    C E R T I F I C A T E

2        I, JAMES M. SULTAN, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify under the pains and penalties of

5   perjury that said transcript (with/without)

6   suggested corrections is a true and accurate record

7   of said testimony.

8        Dated at *Boston*___, this *13th* day of *March*,

9   2006.

10

11   _____

12

13

14

15

16

17

18

19

20

21

22

23

24