UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
******************************
James M. Sultan,              *
                              *
        plaintiff             *
                              *
v.                            *       CIVIL ACTION NO. 04-11107-MLW
VERIZON SERVICES GROUP,       *
                              *
        defendant             *
******************************
```

## PLAINTIFF'S REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW

The plaintiff respectfully requests the Honorable Court to make the following Findings of Fact and Rulings of Law:

Findings of Fact:

1.) The plaintiff, James M. Sultan, was born in Boykin, Alabama on February 14, 1949.

2.) In 1969, he migrated north for a better life.

3.) He is 58 years old; in the Spring of 2001 he was 52 years old.

4.) The plaintiff resides in Dorchester, with his wife. He has four, now adult children.

5.) The plaintiff earned A.A. degrees in civil engineering from Wentworth Institute and in computer science from Boston University, and took many courses in computer technology over the years.

6.) Mr. Sultan began working in the telephone and telecommunications sector for AT&T in 1983.

7.) Mr. Sultan never changed jobs for the next eighteen years, although his employer went through several corporate incarnations (AT&T, to New England Telephone, to Nynex, to Bell Atlantic and finally Verizon).

8.) Mr. Sultan's starting salary at AT&T was $18,000.00; over the years that followed he

received regular promotions, raises and bonuses; in the final full calendar year (2000) before his termination from employment, Mr. Sultan earned a salary of $74,300.00, with a bonus of $5,885, for total compensation of $79,885.00.

9.) Following the merger of his then employer, Bell Atlantic, with GTE to create Verizon, Mr. Sultan voiced certain concerns to his new supervisor, Harvey Jackson; the plaintiff believed that older, long time employees such as himself were having more and more of their work and authority delegated to younger, contract workers and that he was being assigned to train some of these younger, contract workers to replace him. One of these younger, contract workers that Mr. Sultan trained was Michelle LaChapelle, who was in her late twenties or early thirties and remained on with the defendant after Mr. Sultan's firing.

10.) Mr. Sultan requested, as he put it, an "audience" with Mr. Jackson's boss, Bruce Merkis, to discuss these concerns.

11.) Such a meeting was held in Pearl River, N.Y. on 7/31/00. Present were the plaintiff, Mr. Merkis, Harvey Jackson and Bill Driscoll (a contract worker to whom much of the plaintiff's engineering work and authority had been given).

12.) At the Pearl River meeting, Mr. Merkis, in the presence of Mr. Jackson:

    a. Asked the plaintiff his age;

    b. Suggested that he couldn't keep up with the younger workers; and

    c. Told him he wanted the plaintiff gone.

13.) Within days, Mr. Jackson presented the plaintiff with a highly unfavorable job performance review.

14.) The plaintiff found this to be very unusual, given his long, positive track record with the

company.

15.) The appraisal, due in June, was given to the plaintiff just after the Pearl River meeting, in early August, leading him to believe that Mr. Jackson was laying the groundwork for his termination, consonant with the explicit, age based animus voiced by Mr. Merkis at said meeting.

16.) Shortly after the Pearl River meeting, unionized employees at Verizon went on strike. Mr. Sultan and other management level employees assumed new duties. The plaintiff was named Strike Coordinator and, at age 51, was sent to "pole climbing school," in anticipation of management personnel having to perform such functions.

17.) After the strike ended there was a period of time when the company had a lot of catching up to do. When things were running normally again, the plaintiff believed that the campaign to get rid of him had resumed; he believed that his performance was again being unfairly denigrated and that he was being given insufficient time for projects in order to make him look bad.

18.) In March of 2001, Mr. Jackson informed the plaintiff that he is going to be put on a so-called Performance Improvement Plan ("PIP").

19.) Plaintiff believed that he was entitled to have a co-worker present at such a PIP meeting.

20.) On April 26, 2001, the plaintiff was turned away from the PIP meeting because he showed up accompanied by a co-worker, Mr. Bela Hasek. He contacted his then attorney, believing that his so-called Weingarten rights had been violated. He wanted to file a charge with the NLRB. He was told that he can pursue that issue with the National Labor Relations Board subsequently, but that he "shouldn't get himself fired over it."

21.) The plaintiff met with Mr. Jackson on May 1, 2001. A PIP meeting was set for the next day. It is made clear to the plaintiff that he doesn't have the right to have a co-worker present at the meeting.

22.) Mr. Sultan caved; he explicitly and repeatedly yielded to Mr. Jackson's demand that he appear alone at the next day's PIP meeting. He made it clear that he would attend the next day's PIP meeting, alone, as demanded by Mr. Jackson, but that he did not believe that that was right.

23.) Mr. Sultan was terminated at that time, allegedly for "insubordination."

24.) As of May 1, 2001, Mr. Sultan owned a home in Dorchester. As his wife was a full time homemaker, Mr. Sultan's salary was the family's sole source of income, needed to pay the mortgage on the family home.

25.) As well, Mr. Sultan was paying the tuition for a son at UMass-Amherst and had another son at Boston Latin, preparing for college.

26.) Mr. Sultan was not looking to get fired on May 1, 2001; he had the above-described ongoing financial obligations, a long career at the company, a high salary and believed that he could subsequently pursue the issue of whether he had a right to the presence of a co-worker at the PIP meeting.

27.) During that private meeting with Mr. Jackson on May 1, 2001, the plaintiff was polite and soft-spoken; he was never belligerent or disrespectful.

28.) Prior to the May 1, 2001, Mr. Bela Hasek overheard Mr. Jackson discussing the plaintiff on the telephone. The comments attributed to Mr. Jackson further support the conclusion that the alleged insubordination on the part of the plaintiff was a pre-text for unlawful age discrimination.

29.) The termination of the plaintiff for insubordination was a pre-text for unlawful age discrimination, for which the plaintiff is entitled to compensation.

30.) The plaintiff made diligent efforts to find new work and so mitigate his damages.

31.) Mr. Sultan earned the following amounts subsequent to his termination:

   2002: $14,589.00

    2003: $12,786.00

    2004: $31,774.00

    2005: $43,718.00

    2006: $58,233.00

    2007 (to date): $24,264.00

32.) Mr. Sultan planned to work until age 65 or roughly to March of 2014.

33.) He currently works 70 hours per week at two jobs, one as a security guard and one doing computer work for METCO.

34.) Mr. Sultan withdrew funds from his retirement accounts to help make ends meet:

    In 2001, he withdrew $16,000.00 from his retirement account and $22,604.00 from his pension; and

    In 2002, he withdrew $31,600.00 from his retirement account and $$2,200.00 from his pension.

35.) Had Mr. Sultan worked to the present for Verizon (and assuming he never made more than he did in 2000, his last full calendar year at Verizon), he would have earned $485,958.00. His actual earnings to date are $185,364.00, for a net lost income to date of $300,594.00.

36.) If Mr. Sultan worked until age 65, (and assuming he never made more than he did in 2000, his last full calendar year at Verizon), he would have earned from today's date until March of 2014 the amount of $456,853.00. Discounted at 5%, the present value of this loss of future income is $333,032.00. Assuming Mr. Sultan continues to work 70 hours a week at his two current jobs to March of 2014, his expected future earnings, also discounted at 5%, would be $123,821.00. Mr. Sultan's net financial loss would thus be $333,032.00 plus $123,821.00 for a total of $424,415.00.

37.) The termination of his long time employment was very traumatic to Mr. Sultan, who suffered emotional distress, manifested by physical symptoms of headaches, depression, shock, loss of appetite and weight and sleeplessness. He worried about how he would support his family and pay the tuition for his son in college and for the son who was at Boston Latin preparing for college. He withdrew money from his retirement account and pension to make ends meet, and worried about depleting his retirement income.

38.) The defendant knew its termination of the plaintiff was based on his age, justifying the award of not less than two or more than three times his actual damages.

39.) The conduct of the defendant is deserving of condemnation and deterrence, meriting an award of punitive damages.

40.) Plaintiff's counsel is entitled to apply for an award of counsel fees.

Rulings of Law:

1.) This case is brought pursuant to and controlled by Massachusetts General Laws Chapter 151B, the Fair Employment Practices Act.

2.) Paragraph 4(1B) of said Act provides that it shall be an unlawful practice "[f]or an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupation qualification."

3.) Paragraph 8 of said Act provides: "The term 'age' unless a different meaning clearly appears from the context, includes any duration time since an individual's birth of greater than forty years."

4.) Paragraph 9 of said chapter provides, in relevant part: "If the court finds for the petitioner, it

may award the petitioner actual and punitive damages. If the court finds for the petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorney's fees and cost unless special circumstances would render such an award unjust... Any person claiming to be aggrieved by a practice concerning age discrimination in employment made unlawful by section four may bring a civil action under this section for damages or injunctive relief, or both, and shall be entitled to a trial by jury on any issue of fact in an action for damages regardless of whether equitable relief is sought by a party in such action. If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the act or practice complained of was committed with knowledge, or reason to know, that such act or practice violated the provisions of said section four."

5.) Paragraph 9 of the Act provides that it "shall be construed liberally for the accomplishment of its purposes..."

6.) It is well established that one of the principal goals of Mass. Gen. Laws ch. 151B is to "afford victims of discrimination the legal remedy of compensatory damages." Conway v. Electro Switch Corp., 402 Mass. 385, 387 (1988).

7.) Back pay is the amount of the plaintiff's lost earnings from the date of the adverse employment decision to date. It included all lost bonuses, employment benefits, including health insurance and retirement benefits. Conway, supra, at 388-389. This sum must be reduced by the plaintiff's actual earnings, as the plaintiff is required to attempt to mitigate his damages by seeking other employment. Conway, supra, at 389; Buckley Nursing Home v. MCAD, 20 Mass. App. Ct. 172, 185 (1985).

8.) Front pay is the amount of damages resulting from the loss of future earnings and benefits

that is attributable to the employer's misconduct. Although these damages need not be determined with mathematical exactitude, they may not be based on speculation, but upon reasonable estimates based on the evidence concerning the amount of future earnings, including salary, bonuses and benefits that the plaintiff could reasonably expect to have received but for the defendant's unlawful discrimination. These damages, like back pay, must be reduced by the amount of earnings the plaintiff could reasonably expect to receive from other employment. Handrahan v. Red Roof Inns, Inc., 48 Mass. App. Ct. 901, 902 (1999); Conway, supra, at 388-389.

   Front pay damages must be reduced to present value; the amount of money that, if invested today at a reasonable rate of interest, would in the future provide the plaintiff the amount of money determined to be his loss of front pay. Conway, supra, at 388-389; Trinity Church of Boston v. John Hancock Mut. Life Ins. Co., 399 Mass. 43, 52 (1987).

9.) The plaintiff is entitled to recover for emotional distress attributable to the defendant's unlawful discrimination. Emotional distress includes mental pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of the discrimination. Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, the award must be based on just and reasonable inferences from the evidence. Labonte v. Hutchins & Wheeler, 424 Mass. 813, 824 (1997).

10.) In Guttierez v. Massachusetts Bay Transp. Auth., 437 Mass. 396, 412 (2002), the SJC stated that Sullivan v. Boston Gas Co. , 414 Mass 129 (1993) "did not eliminate the physical harm requirement, but merely expanded the range of symptoms that may provide the type of objective evidence to prove physical harm…"

   "A successful negligent infliction of emotional distress claim… must do more than allege "mere

upset, dismay, humiliation, grief and anger... Rather, plaintiffs must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial." Sullivan, supra, at 137-138 (emphasis supplied) ( holding that expert medical testimony on damages is not always required, and that the plaintiff's combination of tension headaches, muscle tenderness in the back of the head, concentration and reading problems, sleeplessness, gastrointestinal distress, upset stomach, nightmares, depression, feelings of despair, difficulty in driving and working, and an overall "lousy" feeling was sufficient). See also O'Meara v. New England Life Flight, Inc., 2004 1588102 (Mass. Super.) (Billings, J.) See also Cariglia v. Hertz Rental Corp., 343 F.Supp. 2d 50 (D.Mass. 2004) (Lindsay, J.) (while there is no mathematical formula to determine emotional distress damages, "because I have found that much of the plaintiff's emotional distress was related to anxiety about how he would support his family during the uncertain years of his unemployment and the use of retirement funds for that purpose, I have determined to measure emotional distress by the amount the plaintiff used from his retirement funds to pay his living expenses.")

11.) In age discrimination cases, if the defendant knew or had reason to know that its conduct with respect to the plaintiff was in violation of the law, then the plaintiff should be awarded at least two but not more than three times his actual damages. G.L.c. 151B, s. 9.

12.) If it is found that the defendant intentionally discriminated against the plaintiff, punitive damages may be awarded him. The purpose of punitive damages is to punish the defendant for conduct that is outrageous because of its evil motive or reckless indifference to the rights of other. Punitive damages are appropriate where the defendant's conduct warrants condemnation and deterrence. Labonte, supra, at 826-827.

13.) The trial court may award double or treble damages, and is not required to make specific findings that employer knew that its discriminatory conduct violated the Act; rather, it is required only to enter finding that employer satisfied the Act's knowledge element. Koster v. Trans World Airlines, Inc., C.A. 1 (Mass.) 1999, 181 F.3d 24.

14.) In a case of discharge from employment, the plaintiff is ordinarily required to show that 1.) he is a member of a class protected by the Act, that 2.) he performed his job at an acceptable level, that 3.) he was terminated, and that 4.) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's." Abramian v. Fellows of Harvard College, 432 Mass. 107 (2000).

15.) Where it is claimed by the defendant that the plaintiff lost his job due to a reduction in force, the plaintiff may satisfy the fourth element by producing some evidence that would raise a reasonable inference of unlawful discrimination. Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 45 (2005).

16.) The plaintiff must present evidence sufficient to establish that but for his age, more likely than not he would not have been discharged. Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 566 (1981).

17.) Age, unlike gender or race, is a relative term and the greater the difference in age between the plaintiff and his or her replacement, the stronger the possible inference of discrimination. Knight v. Avon Products, Inc., 438 Mass. 413, 420-421 (2003).

18.) Deviation from established policy or practice (timely appraisals) may be evidence of pretext. Lattimore v. Polaroid Corp., 99 F.3d 456-467 (1st Cir. 1996).

19.) Unlawful bias on the part of a specific decision maker may be inferred from the attitudes of

others in authority in the company, such as company officials and senior managers. <u>Northeast Metro. Reg'l Vocational Sch. Dist. Sch. Comm. v. MCAD</u>, 31 Mass. App. Ct. 84, 89 (1991). 20.) "In an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind... Permitting, but not requiring the fact finder to draw the inference strikes the proper balance by holding the plaintiff to her ultimate burden without requiring her to produce direct evidence of discriminatory animus, a form of evidence that, we recognize, rarely exists... That inference, combined with the evidence adduced to meet the employee's burden of proof under the first stage of *McDonnell Douglas,* permits the fact finder to conclude that the employee has satisfied her ultimate burden of proving that the decision was made "because of" the unlawful discrimination as G.L.c. 151B, s. 4(1) requires." <u>Lipchitz v. Raytheon</u>, 434 Mass. 493, 501 (2001) (internal citations omitted)

        Respectfully submitted,
        the plaintiff,
        by his attorney:

        /s/ Gregory R. Barison
        _____

        Gregory R. Barison
        Weston Patrick, P.A.
        84 State Street / 11th Floor
        Boston, MA 02109

BBO # 029340

(617) 742-9310

gbarison@comcast.net

May 22, 2007

Certificate of Service

  I, Gregory R. Barison, certify that on May 22, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to defendant by electronically serving it counsel of record.

                                      /s/ Gregory R. Barison